## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

JOHN L. NORMAN,

      Plaintiff,

v.                                        Case No.  4:20-cv-437-MW-MJF

DAVID MADDOX, *et al.,*

      Defendants.

_____/

## REPORT AND RECOMMENDATION

Plaintiff John Norman, a former Florida prisoner proceeding *pro se*, has filed a second amended complaint under 42 U.S.C. § 1983, claiming that five prison officials at the Apalachee Correctional Institution were deliberately indifferent to his safety, in violation of the Eighth Amendment, when they failed to respond reasonably to his cellmate's declaration that he (the cellmate) was "suicidal and homicidal" followed by the cellmate's act of self-harm. Doc. 35.

Defendants move for summary judgment based on qualified immunity and because Plaintiff cannot recover the damages he seeks. Doc. 71 (Mot. for Sum. J.); Docs. 69, 73 (Exs.). Plaintiff has not filed a response opposing the motion. The

undersigned recommends that Defendants' motion for summary judgment be granted based on qualified immunity.[1]

## I. PROCEDURAL HISTORY

The background and procedural history of this case are outlined in the undersigned's order dated January 7, 2021. Doc. 29. In short, this case originated in a Florida court. On June 19, 2020, Plaintiff Norman and another prisoner (Inmate Keona Berg) jointly filed suit in the Circuit Court for Leon County, Florida, Case No. 2020-CA-1220, against ten Defendants. Doc. 1-1, Ex. A at 2-21.[2] At that time, Norman and Berg were incarcerated at the Apalachee Correctional Institution ("Apalachee CI"). *Id*. Their joint complaint asserted a state-law negligence claim and a federal civil rights claim on Berg's behalf, and a federal civil rights claim on Norman's behalf. *Id*. The claims arose from an incident that occurred at Apalachee CI on March 28, 2020. *Id*.

Defendants removed the case to this District Court on September 8, 2020. Doc. 1. On January 7, 2021, the undersigned severed Norman's and Berg's claims,

---

[1] The District Court referred this case to the undersigned to address preliminary matters and to make recommendations regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(C); *see also* 28 U.S.C. § 636(b)(1)(B), (C); Fed. R. Civ. P. 72(b).

[2] All citations to page numbers of court documents are to the numbers assigned by the court's Electronic Case Filing system ("ECF"), as reflected on the ECF header.

and this case became Norman's individual action under § 1983. Doc. 29. Thereafter, Norman filed a second amended complaint limited to his own claims. Doc. 35.

Norman's second amended complaint names five Defendants: Warden David Maddox, Assistant Warden Jonathan Hutchins, Captain Parrish, Officer D. Smith, and Sergeant Wilkes. Doc. 35 at 1-3. Norman sues each Defendant in his individual and official capacity for violating Norman's rights under the Eighth Amendment. *Id.* at 3. Specifically, Norman claims that on March 28, 2020, Smith, Wilkes, and Parrish were deliberately indifferent to his safety when they left him in a cell with Inmate Berg, knowing that Berg: (1) declared a psychological emergency; (2) declared that he was "suicidal and homicidal;" and (3) possessed a razor blade. *Id.* at 6-7, 11-14. Norman claims that Maddox and Hutchins became aware of the situation—and of the continuing risk posed by Norman's confinement with Berg— through grievances both he and Berg filed, but that these Defendants failed to respond reasonably. *Id.* at 8-10, 15-17. As relief for these constitutional violations, Norman seeks compensatory and punitive damages. *Id.* at 11.

This case proceeded through discovery. Doc. 62. The discovery deadline expired on October 14, 2021. *Id.* Norman's subsequent motion to compel and for discovery sanctions, Doc. 67, was denied as untimely and on the merits. Doc. 74. Norman did not appeal the order to the District Court.

On November 4, 2021, Defendants filed their motion for summary judgment. Doc. 71. They assert that: (1) they are entitled to qualified immunity; (2) they are entitled to sovereign immunity on Norman's official-capacity damages claims; (3) Norman's individual-capacity claims for compensatory damages are barred by 42 U.S.C. § 1997e(e); and (4) Norman's allegations fail to state a plausible basis for punitive damages. Doc. 71.

On November 10, 2021, the undersigned ordered Norman to respond to the summary judgment motion and advised him of the procedural and substantive requirements for his response. Doc. 75. The court advised the parties that on December 1, 2021, Defendants' motion for summary judgment would be deemed "submitted" on the motion, the pleadings, and the evidentiary materials filed in this case. Additionally, any document or evidence filed after the submission date would not be considered by the court, absent exceptional circumstances. *Id*.

On November 15, 2021, Norman filed a motion seeking to "supplement" his motion to compel and for discovery sanctions. Doc. 77. Norman then was released from incarceration on November 18, 2021. Doc. 79. On November 29, 2021, Norman filed a motion for the undersigned to "reconsider" his motion to compel and for discovery sanctions. Doc. 76. The undersigned denied the motions. Doc. 78. Norman did not appeal the order to the District Court.

On December 3, 2021, Norman filed a motion to extend the summary judgment submission date by 60 days. Doc. 80. The undersigned denied the motion as untimely and for Norman's failure to show excusable neglect, and because Norman also failed to show good cause to extend the submission date. Doc. 81. The undersigned noted that Norman did not describe any effort he made to prepare a response to the summary judgment motion before the December 1, 2021 deadline. *Id*. The undersigned nevertheless extended the summary judgment submission date to January 4, 2022. *Id*. The undersigned reiterated that any documents or evidence filed after the submission date would not be considered by the court absent exceptional circumstances. *Id*. Norman did not appeal the order to the District Court.

On January 3, 2022, Norman filed a motion for reconsideration and a motion to extend the submission date further. Docs. 83, 84. The undersigned denied the motions. Docs. 85, 86. Norman did not appeal either order to the District Court.

To date, Norman has not offered an affidavit, a response, or any other documents or evidence for consideration on summary judgment.

## II. SUMMARY JUDGMENT STANDARD

"Summary judgment is proper when 'there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.'" *Jacoby v. Baldwin County*, 835 F.3d 1338, 1343 (11th Cir. 2016) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)) (alteration adopted); *see also* Fed. R.

Civ. P. 56(a). "Where there are varying accounts of what happened on summary judgment, [the court is] required to adopt the account most favorable to the nonmoving party." *Prosper v. Martin*, 989 F.3d 1242, 1252 (11th Cir. 2021) (internal quotation marks and citations omitted). "This principle, though, is subject to the caveat that the nonmoving party's version of events must be sufficiently supported by the record that a reasonable jury could find it to be true." *Prosper*, 989 F.3d at 1252; *see* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by citing to particular parts of materials in the record."); *Chapman v. A1 Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) ("A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.").

The court "will not treat as true a party's unfounded speculation about what happened." *Prosper*, 989 F.3d at 1252 (citing *Blackston v. Shook and Fletcher Insulation Co.*, 764 F.2d 1480, 1482 (11th Cir. 1985), and *Smith v. LePage*, 834 F.3d 1285, 1296 (11th Cir. 2016)). Summary judgment is warranted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## III. FACTS

The facts set forth below are drawn from the following sources: (1) the allegations of Norman's verified second amended complaint, Doc. 35, that are based on his personal knowledge;[3] (2) Norman's deposition testimony, Doc. 69-1; (3) Defendants' undisputed "Statement of Facts" included in their motion for summary judgment, Doc. 71 at 1-7;[4] and (3) the evidentiary materials provided with Defendants' motion for summary judgment, Docs. 69, 73.

Norman was incarcerated at Apalachee CI in 2020. Doc. 35 at 6, ¶ 1. On March 26, 2020, Norman was placed in administrative confinement in Y dorm, Wing 2, Cell 104 ("Y2-104"). Doc. 69-1 at 17:10-23 (Norman Dep.). During the entire time Norman was housed in Y2-104, his cellmate was Keona Berg. *Id*. at 16:10 –

---

[3] "A *pro se* plaintiff's complaint, . . . if verified under 28 U.S.C. § 1746, is equivalent to an affidavit, and thus may be viewed as evidence." *Howard v. Memnon*, 572 F. App'x 692, 694 (11th Cir. 2014) (citing *Murrell v. Bennett*, 615 F.2d 306, 310 n.5 (5th Cir. 1980), and quoting Fed. R. Civ. P. 56(c)(4)) (footnote omitted). However, "[a]n affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

[4] The undersigned considers the facts set forth in Defendants' "Statement of Facts" as undisputed for purposes of ruling on their motion for summary judgment, because Norman (1) has not responded to the motion for summary judgment; (2) has not asserted that any fact stated in Defendants' "Statement of Facts" is genuinely disputed, much less cited to particular parts of materials in the record; and (3) has not properly addressed any assertion of fact made in Defendants' "Statement of Facts." *See* Fed. R. Civ. P. 56(c), (e); *see also Jacoby*, 835 F.3d at 1343 n.2.

17:20. Norman remained in cell Y2-104 with inmate Berg, until Norman was transferred to Charlotte Correctional Institution on September 4, 2020. *Id*. at 13:16-19; 16:10-16. In other words, Norman and Berg were cellmates for over 5 months.

The incident underlying Norman's failure-to-protect claim occurred on Saturday, March 28, 2020. *Id*. at 20:13-16. On that date, Defendant Officer Smith brought the afternoon meal sometime between 3:00 and 4:00 p.m. *Id*. at 20:17-21; 21:18-20. Smith placed Norman's and Berg's food trays on the flap to their cell door. *Id*. at 22:5-21. Berg's meal was missing additional food (a sandwich) that was part of his special diet. *Id*. at 20:23-25. Berg told Smith that he needed an additional sandwich, to which Smith stated, "I hear you," and walked away. *Id*. at 21:2-5; 22:22-24. Smith had to continue giving the other inmates on the wing their afternoon meals. *Id*. at 23:2-5.

Smith returned to Norman and Berg's cell 15-20 minutes later. *Id*. at 24:8-11. During this time, Berg had not touched his meal which was still sitting on the flap to the cell door. *Id*. at 22:5-20; 24:12-15. Smith left again and returned about 10 minutes later with the food cart to pick up trays. *Id*. at 24:4 – 25:9. Berg had not touched his tray during this 25-30 minute period, so Smith collected both Norman's and Berg's food trays. *Id*. at 24:4 – 25:23.

When Smith was taking the trays away, Berg asked Smith "Where's my diet?" *Id*. at 27:1-2, and informed Smith that he was having "a psychological issue." *Id*. at 31:9-10; 32:1-4. Smith walked away and continued collecting trays. *Id*. at 32:5-9.

Berg started screaming, took a razor blade that he had concealed inside of his mouth, and concealed the blade in his hand. *Id*. at 27:3-4; 32:19-25. Smith returned to Norman and Berg's cell. *Id*. at 32:15-16. Berg told Smith "I'm having problems." *Id*. Smith responded, "Yeah, I hear you," and left again. *Id*. at 32:16-17. Smith did not see the razor blade, because Berg was concealing it in his hand. *Id*. at 32:25 – 33:2.

Berg told Norman that he "was going to become homicidal and suicidal." *Id*. at 27:4-7. Berg explained to Norman: "I can't take this. I'm losing it. And I can't deal with this. I'm going to flip out." *Id*. at 27:24-25; 28:1-4; *see also id*. at 33:3-11.

Approximately 10 minutes later, Nurse Moore, who was dispensing medication in the dormitory, came to Berg's cell and gave Berg his medication. *Id*. at 32:17-18; 33:3-6, 21-25; 34:1-3; 36:5-7. Smith accompanied Moore. *Id*. at 35: 4-10. Berg told Nurse Moore that he was having a psychological emergency. *Id*. at 36:10-11. Moore responded that unfortunately there were no mental health staff at Apalachee CI that day. *Id*. at 36:8-14, 23-25.

At no time did Norman or Berg inform Smith or Moore that Berg had a razor blade. *Id*. at 37:23 – 38:1.

Smith and Nurse Moore left Norman and Berg's cell and continued down the row of cells dispensing medication to other inmates. *Id*. at 37:5-7. Berg started cutting his left arm with the razor blade and yelling that he was homicidal and suicidal. *Id*. at 37:8-11, 19-22. Berg made four or five cuts on his arm. *Id*. at 38:22-23. When Norman saw that Berg was bleeding, Norman yelled, "man down." *Id*. at 38:25 – 39:1. Other inmates joined Norman in yelling, "man down." *Id*.

Sergeant Wilkes and Officer Smith responded to Norman and Berg's cell. *Id*. at 39:6-7; 40: 2-3. Norman was standing at the cell door facing the officers, and Berg was standing near the toilet at the back of the cell. *Id*. at 44:7-11; *see also id*. at 43:15-21; 47:3-5. Norman told Wilkes and Smith that Berg was bleeding. *Id*. at 39:20-21. Wilkes allegedly commented to Berg, "What are you doing? . . . Well, you'd better cut deeper before we do anything for you. You need to fill the room up with blood." *Id*. at 41:20-23.

Norman does not know if Berg's razor blade was visible to Wilkes or Smith, because Norman was facing the front of the cell looking at the officers. *Id*. at 45:1-18. Norman did not tell Wilkes or Smith that Berg had a razor blade, nor did Norman indicate to the officers how Berg cut himself. *Id*. 45:19-21. Norman was concerned more with how the officers would react to Berg cutting himself, than with Berg's possession of the razor blade. *Id*. at 42:1-9. Norman explained:

> [T]his is my understanding. I've seen them pull out their can and start spraying the person that's cutting. Okay. With, you know, the gas. So I was more concerned with am I going to get sprayed at this point in time or not.

*Id*. at 42:5-9.

Berg stated that he was "suicidal and homicidal." *Id*. at 45:24 – 46:1. Wilkes and Smith left the cell for 2-3 minutes. *Id*. at 46:13-18. During that brief period, Norman told Berg "something to the effect of you need to relax. . . . I don't think they're going to help you." *Id*. at 48:15-21. When Wilkes returned, he provided a Band-Aid for Berg. *Id*. at 46:13-18. Norman did not tell Wilkes or Smith that Berg had a razor blade. *Id*. at 47:7-9. Norman does not know whether Wilkes or Smith could see the razor blade. *Id*. at 47:10-13. During this entire time, Norman was at the front of the cell and Berg was at the back of the cell. *Id*. at 48:22 – 49:4.

Wilkes and Smith walked toward the sergeant's office. *Id*. at 49:22-24. During the next 15-20 minutes, Berg intermittently yelled "psychological emergency," and "homicidal suicidal." *Id*. at 50:21-24. Wilkes returned to Norman and Berg's cell with Captain Parrish. *Id*. at 50:3-15. Parrish told Berg: "You need to stop that or I'm going to shake the wing down. And if I find one packet of sugar I'm stripping everybody on the wing." *Id*. at 51:11-13. Again, Norman was at the front of the cell facing the officers, and could not tell whether Wilkes or Parrish saw Berg's razor

blade. *Id*. at 52:11-14. Norman did not tell the officers that Berg had a razor blade. *Id*. at 52:15-22.

When the officers left, Berg put the razor blade back into his mouth. *Id*. at 60:3-9; *see also id*. at 61:7-11.

Within 2-3 minutes, Parrish returned to Berg's cell with Wilkes and Smith, and ordered Berg to strip and submit to hand restraints. *Id*. at 53:19-21; *see also id*. at 60:10 – 61:6. Berg stripped to his boxer shorts and put his arms through the bars. Berg's hands were restrained, and he was taken out of the cell. *Id*. at 53:19 – 54:3. Even at that point, Norman did not advise any officer that Berg had a razor blade, much less tell them where Berg had secreted it. *Id*. at 56:7 – 57:7; 59:13 – 62:8.

Parrish took Berg to the sergeant's office to be evaluated by Nurse Moore. *Id*. at 54:3; 66:17-22; Doc. 73. The evaluation lasted approximately 15 minutes. *Id*. at 57:8-9. After meeting with Berg, at 5:00 p.m. on March 28, 2020, Nurse Moore made an urgent Staff Request/Referral to the Mental Health Department, and described the behavior Berg exhibited that caused her concern. Doc. 1-1 at 5 in ECF (Pls.' Compl.); Doc. 69-4 (redacted Staff Request/Referral form); Doc. 73 (unredacted Staff Request/Referral form); *see also* Doc. 69-1 at 67:1-8 (Norman Dep.). The behavior Moore described does not suggest that Berg posed a risk of harm to others. Doc. 73. Nurse Moore assured Berg that a mental health provider would see him on Monday. Doc. 35 at 8 ¶ 3.

Security staff returned Berg to his and Norman's cell. Doc. 69-1 at 62:9-11. When Berg returned, he was not excited or in a heightened state, but rather was depressed. *Id*. at 86:1-6. Norman's deposition testimony described Berg's demeanor as "kind of disappointed what he just went through was not what it turned out to be." *Id*. at 86:8-10. Berg told Norman that he had wanted to get out of administrative confinement and that he was disappointed he did not get out. *Id*. at 86:11-17. Norman assisted Berg in applying toilet paper to his arm to stop the bleeding. *Id*. at 66:7-10. Smith, Wilkes and Parrish's shift ended at 6:00 p.m., approximately one hour after Berg met with Moore. *Id*. at 68: 23-25. After the shift change and new security officers came on shift, Norman did not inform anyone that he was afraid of being housed with Berg, or that Berg had a razor blade. *Id*. at 70:7-24.

Norman and Berg remained cellmates until September 4, 2020, at which time they were transferred to different institutions. *Id*. at 62:12-14. From March 28, 2020, until September 4, 2020, Norman saw Berg's razor blade "once or twice," but did not tell anyone. *Id*. at 62:15-25; 64:19 – 65:17. Berg did not use the razor blade again. *Id*. at 62:18-20; 82:13-16.

During the entire time Norman was confined with Berg from March 26, 2020, to September 4, 2020, Norman and Berg did not have any altercation, nor did Berg ever physically injure Norman. *Id*. at 71:1-5, 12-15. During that time, medical staff visited Berg on a daily basis, at least twice per day. *Id*. at 71:24 – 72:14. Sometimes

the staff member was a medical nurse and other times the staff member was a mental health nurse. *Id*. at 74:20-24. From March 28, 2020, to September 4, 2020, Berg declared a psychological emergency on various occasions, but neither Smith, Wilkes, nor Parrish was working at the time. *Id*. at 79:16 – 80:3.

Defendant Warden Maddox and Defendant Assistant Warden Hutchins were not present in Y Dormitory on March 28, 2020. *Id*. at 82:17-22. Maddox and Hutchins had no direct involvement in the incident on that date; rather, their involvement was that they responded to grievances later filed by Norman and Berg. *Id*. at 82:23 – 83:2. Norman was the one who prepared the grievance that Berg filed. *Id*. at 82:10-16.

Specifically, Berg filed a formal grievance on March 30, 2020, which was prepared by Norman on March 29, 2020. *Id*. at 83:6-13; *Id*. at 84:20 – 85:1; *see also* Doc. 69-2 (Berg's formal grievance, Log #2003-102-209). The remedy sought in Berg's formal grievance was to receive mental health assistance. Doc. 69-2. Berg's formal grievance did not mention that Berg had a razor blade. *Id*. Dr. Jetton of Apalachee CI responded to the grievance as follows:

> Your Request for Administrative Remedy or Appeal has been reviewed, evaluated and responded to as follows: Medical staff were contacted and they stated that you have been scheduled with mental health; watch the call-out.

Doc. 69-2. Warden Maddox signed the response on April 15, 2020. *Id*.

On April 27, 2020, Norman prepared and filed an informal grievance on his own behalf. Doc. 69-3. Norman's informal grievance related the events of March 28, 2020, except Norman did not identify what Berg used to cut himself or mention that Berg had a razor blade. *Id*. Norman also did not reveal that Berg still possessed a razor blade. Norman reported no harm to himself as a result of being left in the cell with Berg, except the emotional stress associated with being housed in administrative confinement with inmates who had mental health issues. *Id.* Norman complained that the Mental Health Department was not providing Berg with treatment. Norman stated, in relevant part:

> This inmate provides that due to Mental Health's failure to address this inmate's bunkie's mental health issues, this inmate remains suicidal and homicidal, which further supports the Eighth Amendment claim of failure to protect both this inmate as the past actions of the bunkie have and continue to place this inmate in a risk of possible serious harm and the failure to treat the bunkie also places the bunkie in a risk of possible serious harm.

> It is a constitutional violation to allow this inmate to be subjected to severe mental health inmates. This inmate asserts that this grievance applies to this inmate's continued subjection to possible homicidal actions of his bunkie, as mental health and security fail to assist this inmate when he snaps and claims psychological emergency. This inmate was woke up by the screams of another inmate within Y2-108 while he was trying to hang himself. This violates this inmate's right to normal living standards as Y2 is inhuman conditions, which violates Farmer vs Brennan 114 S. Ct. 1970 (1994) because the mental health care is inadequate "grossly," this violates Russell vs Johnson 376 F.3d 373 (5th Cir. 2004) and because security staff C.O. Smith, Sgt. Witte, Capt. Parrish, saw this inmate's bunkie trying to harm himself and he stated "I am homicidal and suicidal" which placed the bunkie and this

inmate in harms [sic] way, and violates the Constitution for a failure to protect this inmate John Norman, and mental health staff has not brought the bunkie to the Doctor, or placed him in TCU for cutting himself and screaming psychological emergency multiple times since that time, places this inmate and this inmate's bunkie in a failure to protect constitutional violation, as at any time this inmate's bunkie could snap and either harm himself or harm this inmate.

This grievance unequivocally is a grievance based upon this inmate John Norman's subjection to continued constitutional violations within Y2.

Remedy: For this institution to place this inmate in as near close as possible environment representative of that of general population 33-602.221(2)(a).

Doc. 69-3.

Assistant Warden Hutchins responded to Norman's informal grievance on

May 1, 2020, stating:

A review was completed. All staff denied placing you or your cellmate in harms [sic] way. If you feel you need to see Mental Health I will get you help. Please be patient and let the process work.

cc: Medical

. . . .

Based on the above information, your grievance is Approved. If your informal grievance is denied, you have the right to submit a formal grievance in accordance with Chapter 33-103.006, F.A.C.

Doc. 69-3.

After receiving Hutchins's response, Norman did not seek any medical or mental health treatment related to his confinement with Berg. Doc. 69-1 at 76:16-18; 77:4-24.

Norman does not describe any injury he sustained as a result of being housed with Berg. Doc. 35. As relief in this lawsuit, Norman seeks "judgement [sic] against all Defendants for damages compensatory and punitive, as well as costs of litigation and Attorney's fees." Doc. 35 at 11.

### IV. QUALIFIED IMMUNITY AND EIGHTH AMENDMENT STANDARDS

#### A. *Qualified Immunity Standard*

Defendants seek summary judgment on the grounds that (1) Norman cannot establish that they violated the Eighth Amendment, and (2) they are entitled to qualified immunity. Doc. 71. "Under the qualified immunity doctrine, government officials performing discretionary functions are immune not just from liability, but from suit, unless the conduct which is the basis for suit violates clearly established federal statutory or constitutional rights of which a reasonable person would have known." *Sanders v. Howze*, 177 F.3d 1245, 1249 (11th Cir. 1999) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "To be entitled to qualified immunity, the defendant must first establish that he was acting within the scope of his discretionary authority." *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017) (citing *Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013)).

Once that is shown, and it is undisputed here, "the burden shifts to the plaintiff to establish that qualified immunity is not appropriate." *Gaines*, 871 F.3d at 1208. The plaintiff must prove that "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004). "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 583 U.S. ___ , 138 S. Ct. 577, 589 (2018) (internal quotation marks and citations omitted). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

**B.    *Eighth Amendment Failure-to-Protect Standard***

Prison officials "must provide humane conditions of confinement; [they] must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). "[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (internal quotation marks and citations omitted). To succeed on a failure-to-protect claim, a plaintiff must prove three elements: (1) that he was "incarcerated under conditions posting a substantial

Page 18 of 42

risk of serious harm," *Farmer*, 511 U.S. at 834; (2) that the "prison official [had] a sufficiently culpable state of mind," amounting to "deliberate indifference," *Farmer*, 511 U.S. at 834 (internal quotation marks omitted); and (3) that the constitutional violation caused his injuries. *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014).

Whether an unsafe condition results in a substantial risk of harm is determined using an objective standard. *See Farmer*, 511 U.S. at 834 (describing the objective component of an Eighth Amendment claim based on a failure to prevent harm); *Caldwell,* 748 F.3d at 1099 (explaining that "the court uses an objective standard" when examining the "substantial risk of serious harm" element); *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003) (holding that the risk "must be an objectively substantial risk of serious harm"). There must be a strong likelihood of injury as opposed to a mere possibility. *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990).

"The second element—the defendant's deliberate indifference to that risk—has two components: one subjective and one objective." *Caldwell,* 748 F.3d at 1099. The plaintiff "must show both that the defendant actually (subjectively) knew that an inmate faced a substantial risk of serious harm and that the defendant disregarded that known risk by failing to respond to it in an (objectively) reasonable manner." *Bowen v. Warden Baldwin State Prison*, 826 F.3d 1312, 1320 (11th Cir. 2016);

*Marsh v. Butler County, Alabama*, 268 F.3d 1014, 1027 (11th Cir. 2001) ("[O]fficials, to be liable, must be aware of a substantial risk of serious harm to the inmates and not take reasonable measures to alleviate that risk.").

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842. Even if the plaintiff makes a sufficient showing of the defendant's subjective knowledge of a substantial risk, he still must make the additional showing that the defendant's response was objectively unreasonable. *Farmer*, 511 U.S. at 844 ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk. . . .").

A defendant may avoid liability by showing that he was unaware of the underlying facts indicating a substantial risk, that he "believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent," or that he "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. "A plaintiff's failure to give advance notice to prison officials of a specific threat or of his fear of an inmate is relevant to this inquiry, though it is not dispositive." *Moulds v. Bullard*, 345 F. App'x 387, 392 (11th Cir. 2009) (citing *Carter v. Galloway*, 352 F.3d 1346, 1349-50 (11th Cir. 2003), and *Farmer*, 511 U.S. at 848).

Finally, a plaintiff must show that the constitutional violation caused his injury. *Cottone*, 326 F.3d at 1359. "[S]ection 1983 requires proof of an affirmative causal connection between the actions taken by a particular person under color of state law and the constitutional deprivation." *LaMarca v. Turner*, 995 F.2d 1526, 1538 (11th Cir. 1993). The constitutional deprivation must, in turn, be "a legal cause of [the plaintiff's] injuries." *Williams v. Bennett*, 689 F.2d 1370, 1381 (11th Cir. 1982).

## V. DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

**A.**  *Norman Has Not Presented Sufficient Evidence to Create a Genuine Issue of Material Fact as to Whether His Eighth-Amendment Right Was Violated*

**i.**   **The Undisputed Material Facts Show that Neither Smith, Wilkes, Nor Parrish Was Deliberately Indifferent to a Known, Substantial Risk of Harm to Norman's Safety**

Norman claims that Smith, Wilkes, and Parrish were deliberately indifferent to his safety because after Berg declared that he was "suicidal and homicidal" and cut himself, the Defendants did not search the cell or Berg for the cutting instrument, and did not either move Norman to a different cell than Berg, or move Berg to a Self-Harm Observation ("SHO") cell. Doc. 35 at 8, ¶ 3 and 12-14, ¶¶ 9-14. The Defendants argue that Norman cannot satisfy the "deliberate indifference" element of his claim, because he has produced no evidence from which a reasonable jury

could infer that they (1) possessed the requisite culpable state of mind and (2) responded unreasonably. Doc. 71 at 12-15.

Concerning the subjective component of Norman's deliberate indifference claim, the undisputed facts show that Smith, Wilkes and Parrish were aware that: (1) Berg declared a psychological emergency; (2) Berg stated that he "was suicidal and homicidal;" (3) Berg cut his own arm; (4) Norman called for assistance for Berg after Berg cut his own arm; and (5) Berg was fully compliant with their orders. The undisputed facts further establish that (1) Norman did not inform Smith, Wilkes, or Parrish that he feared Berg or that he believed Berg posed a danger to him either before or after Berg cut himself; (2) Norman did not inform Smith, Wilkes, or Parrish about the razor blade or its location; (3) Berg and Norman had not had any altercations while confined together; and (4) Norman did not ask Smith, Wilkes, or Parrish to move him to another cell.

Norman has produced no evidence that: (1) Smith, Wilkes, or Parrish saw Berg's razor blade; or (2) Nurse Moore recommended anything other than returning Berg to his cell with Norman. Norman also has produced no evidence that Berg's demeanor, statements, or actions after meeting with Nurse Moore indicated to Smith, Wilkes, or Parrish that Berg posed a substantial threat to Norman's safety.

The only evidence Norman identifies to show that Smith, Wilkes, or Parrish was subjectively aware that Berg posed a threat to *Norman* is the fact that Berg yelled

"homicidal suicidal" before cutting himself, and that Berg obviously possessed an object sharp enough to cut himself. Doc. 69-1 at 49:23-24. But that evidence must be viewed in the context of all of the facts known to the officers at the time. The Eleventh Circuit has emphasized: "In deliberate-indifference cases, as in life, context matters." *Mosley v. Zachery*, 966 F.3d 1265, 1272 (11th Cir. 2020).

Berg's statement and possession of a sharp object, when viewed in the context of all of the undisputed facts just recited, does not reasonably support a finding that Smith, Wilkes, or Parrish "was aware of facts from which the inference could be drawn that a *substantial* risk of serious harm" to *Norman* existed, and that these prison officials "dr[ew] the inference." *Farmer*, 511 U.S. at 837 (emphasis added); *see also Marbury v. Warden*, 936 F.3d 1227, 1236 (11th Cir. 2019) ("Successful deliberate-indifference claims will generally require some further reason[s]—beyond the plaintiff having informed the defendant officers of the threat—that a prison official could have concluded that a particular threat evidenced a *substantial* threat, rather than the mere *possibility*, of serious harm." (emphasis added)). There is no evidence from which a reasonable jury could infer that Smith, Wilkes, or Parrish knew that Berg posed a substantial danger to anyone other than himself.

In addition to failing to create a triable issue on the subjective component of deliberate indifference, Norman also fails to create a triable issue on the objective component. Norman asserts that the only reasonable response had to include

protecting *his* safety by either separating him from Berg or finding the object Berg used to cut himself.

"The reasonableness of a prison official's response to a threat does not rise or fall on [an] all-or-nothing, one-size-fits-all approach." *Mosley*, 966 F.3d at 1271. Instead, "[t]he reasonableness of a prison official's response to a substantial risk of serious harm depends on the facts the official knew when [ ]he learned about the threat." *Mosley*, 966 F.3d at 1268.

Based on the summary judgment evidence, a reasonable jury could not find that Smith's, Wilkes's, or Parrish's response to the threat Berg posed to Norman—assuming that some degree of threat existed—was objectively unreasonable. Smith stopped at Norman and Berg's cell several times as the incident on March 28, 2020 unfolded. When Berg told Smith that he was having a psychological issue, Smith assured Berg, "I hear you." Doc. 69-1 at 32:1-18. Berg was concealing the razor blade at that time. Smith returned approximately 10 minutes later with Nurse Moore who administered Berg's medication. Smith overheard Berg tell Moore that he was having a psychological emergency, and overheard Moore tell Berg that unfortunately no one from mental health was available that day. Berg was concealing the razor blade at that time. After administering Berg's medication, Moore and Smith moved to the next cell to continue medication distribution.

According to Norman, shortly after this, Berg began cutting his arm and yelling that he was "homicidal and suicidal." There is no evidence that any Defendant heard Berg. But after Norman and other inmates yelled, "man down," Wilkes and Smith responded to Norman and Berg's cell. Wilkes and Smith saw Berg at the back of the cell with his arm bleeding, and observed Norman at the front of the cell facing them. Berg stated to Wilkes and Smith that he was "suicidal and homicidal." Wilkes brought Berg a Band-Aid for his arm and, approximately 15-20 minutes later, Smith and Wilkes returned with Parrish. During that 15-20 minute period, the officers consulted with Nurse Moore and arranged for her to evaluate Berg in the sergeant's office.

When Smith, Wilkes, and Parrish arrived back at Berg's cell to escort him to the sergeant's office, they ordered Berg to strip to his boxers and submit to hand restraints. Berg was fully compliant. Smith, Wilkes and Parrish then took Berg to meet with Nurse Moore, leaving Norman alone and in sole control of the cell (and Berg's belongings) for approximately 15 minutes.

After Berg finished meeting with Moore, the Defendants returned Berg to his cell. Again, nothing in the record suggests that Moore recommended anything other than returning Berg to his cell with Norman. After the meeting with Moore, Berg was not in a heightened or excited state anymore, but rather was subdued and depressed. When the Defendants returned Berg to the cell, Norman did not express

concern for his (Norman's) safety, or ask to be separated from Berg. Neither Norman nor Berg expressed any additional concerns about Berg's psychological state to Smith, Wilkes, or Parrish during the remainder of their shifts. Norman did not mention the razor blade to Smith, Wilkes, or Parrish, and did not inquire whether they had recovered it. Norman and Berg worked together the remainder of the day to care for Berg's arm.

Norman makes much of the fact that Smith, Wilkes, and Parrish failed to search Berg and the cell to try to find the object with which Berg cut himself. Norman believes that a search was required by FDC policy and was necessary to ensure Norman's safety. *See* Doc. 35 at 8, ¶ 3; Doc. 69-1 at 81:25 – 82:12. Norman admits, though, that the officers ordered Berg to strip before taking him to see Nurse Moore; that Berg was fully compliant such that no cell entry, cell extraction, or force was necessary; and that the razor blade was not visible on Berg's person because Berg concealed it in his mouth. Norman also admits that the officers' removal of Berg from the cell for 15 minutes afforded him the opportunity to find and dispose of the razor had it been in the cell. And Norman further admits that he made no attempt, ever, to tell the officers the location of the razor even though he knew precisely where it was.

The point is that even if the officers did not search Berg or the cell, that may demonstrate negligence, but it does not show that Smith, Wilkes, or Parrish *knew*

Page 26 of 42

that failing to recover the object with which Berg *cut his own arm* posed a substantial risk of serious harm to *Norman*. The deliberate indifference standard is "far more onerous" than the negligence standard. *Goodman v. Kimbrough*, 718 F.3d 1325, 1332 (11th Cir. 2013). An Eighth Amendment violation occurs only "when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not respond reasonably to the risk." *Mosley*, 966 F.3d at 1267-68 (internal quotation marks and citation omitted; alteration adopted).

Because a reasonable jury could not find that Smith, Wilkes, or Parrish violated Norman's constitutional rights, these Defendants are entitled to summary judgment based on qualified immunity. *See Prison Legal News v. Geo Group, Inc.*, 920 F. Supp. 2d 1270, 1272 (N.D. Fla. 2013) ("'Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial,' and summary judgment should be entered." (quoting *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997))).

### ii.   The Undisputed Material Facts Show that Neither Maddox Nor Hutchins Was Deliberately Indifferent to a Known Substantial Risk of Harm to Norman's Safety

Norman claims that Hutchins and Maddox were deliberately indifferent to his safety because they "took no action" after Berg and Norman informed them via grievances that Norman was housed with a "suicidal and homicidal inmate whom [sic] had cut himself with a razor blade." Doc. 35 at 15, ¶ 6; *Id.* at 15, ¶ 7. Norman

explains that his informal grievance to Hutchins detailed above, and Berg's formal grievance to Maddox detailed above, "placed [them] on notice . . . that Berg was dangerous." *Id*. at 16, ¶ 9. Norman claims that each Defendant's response to the respective grievance he reviewed was unreasonable, because "both Defendants chose to leave the Plaintiff in Y2-104 with Berg, not shake the cell down to look for the razor blade, the entire time the Plaintiff and Berg were in the cell together form March 26, 2020 until September 4, 2020, even though both wardens approved grievances." *Id*.

Based on the summary judgment evidence, Maddox's knowledge of the situation was confined to the information provided in Berg's formal grievance. Doc. 69-1 at 89:15-18 (Norman Dep.). Berg's formal grievance is dated March 30, 2020, which is the Monday following the March 28, 2020, incident. Doc. 69-2 at 1. Berg's formal grievance begins by stating that it "relates to a mental health issue and the issues this inmate [Berg] suffered which lead [sic] up to this mental health breakdown." *Id*. at 1. Berg's formal grievance mentions that on March 28, 2020, Berg declared a psychological emergency, and screamed, "I am suicidal and homicidal," but no one came to his cell. *Id*. at 1. Berg described that he then "began trying to cut his veins in his arm," at which time other inmates yelled "man down." *Id*. at 1. Berg's grievance described Wilkes's and Parrish's initial responses that were followed by their taking Berg to be evaluated by Nurse Moore. *Id*. at 1-2. Berg's

grievance described his meeting with Moore, including that Moore informed him that there were no mental health cells or mental health staff available, that Moore would submit an urgent mental health referral, and that someone from mental health would be there on Monday, March 30, to assist Berg. *Id*. at 2. Berg's grievance explained that he still was having "sever[e] mental health issues" and had not received medical or mental health assistance. *Id*. at 2. Berg sought, as a "remedy," the following: "This inmate needs mental health assistance as soon as possible." *Id*. at 2.

Contrary to the allegation in Norman's second amended complaint, Berg's formal grievance does not mention Berg's use of a razor blade, or imply that Berg still had the object with which he cut himself. Berg's grievance does not state, or even suggest, that his "mental health issues" pose a threat to others or, more specifically, to his cellmate. Berg's grievance does not even mention a cellmate. The summary judgment evidence, viewed in the light most favorable to Norman, does not reasonably support an inference that Maddox actually subjectively knew—from Berg's statements in his grievance—that *Norman* faced a substantial risk of serious harm. *See Bowen*, 826 F.3d at 1320. Again, neither Norman specifically, nor a cellmate in general, is mentioned anywhere in Berg's grievance.

Moreover, the evidence shows that Maddox responded reasonably to the facts he learned from the grievance and the medical department's response. Berg's

grievance requested mental health assistance. Doc. 69-2 at 2. A doctor at Apalachee CI responded to the grievance by informing Berg that he had been scheduled with mental health as requested, and that he should "watch the call-out." *Id*. at 3. Maddox signed off on the response on April 15, 2020. *Id*. at 3. Judging Maddox's response based on the facts presented to him in the grievance, it was not unreasonable for him to confine his response to addressing the need expressed by Berg—receiving mental health care—and to rely on the medical department to follow through with the scheduled appointment. Because Norman has not met the deliberate-indifference element of his failure-to-protect Eighth Amendment claim against Maddox, this Defendant is entitled to summary judgment in his favor.

Concerning Hutchins, Norman admits that Assistant Warden Hutchins did not know any information about the March 28, 2020, incident other than what Norman described in his informal grievance. Doc. 69-1 at 89:15-18. Norman's informal grievance, dated April 27, 2020 complained generally that he was on protective management status and was supposed to be confined in conditions that closely resembled the general population, but that he instead was being "subjected to severe mental health inmates." Doc. 69-3 at 2.

Norman's informal grievance also complained, specifically, about being confined with Berg who suffered from mental health issues. Norman described the incident on March 28, 2020, and claimed that Berg's "actions" on that date posed a

substantial risk of harm to Norman. Doc. 69-3 at 1 ("[T]he past actions of the bunkie have and continue to place this inmate in a risk of possible serious harm and the failure to treat the bunkie also places the bunkie in a risk of possible serious harm."). The only action Norman described, though, was that on March 28, 2020, Berg "claimed a psychological emergency and screamed he was suicidal and homicidal and began trying to cut his veins and began to bleed." *Id*. at 1. Norman described no action suggesting that Berg attempted to harm Norman. Norman made no mention that Berg currently possessed a razor blade or any other dangerous object. Norman asserted that Berg's failure to receive appropriate mental health treatment placed Norman "in a failure to protect Constitutional violation, as at any time this inmate's bunkie could snap and either harm himself or harm this inmate." Doc. 69-3.

Norman's informal grievance does not reasonably support an inference that Hutchins actually subjectively knew that Norman faced a substantial risk of harm to his safety by being confined with Berg after the March 28, 2020 incident. As demonstrated by Hutchins's response to the grievance, the only present need Hutchins perceived in relation to Norman was a possible need for Norman to receive mental health counseling to deal with the stress of being housed in administrative confinement with inmates suffering from mental health issues.

Hutchins's response to the need he perceived was reasonable. Hutchins offered to assist Norman in coping with any mental health stress by getting him help.

Doc. 69-3 at 1. Hutchins also encouraged Norman to "be patient" and "let the process work." *Id*. at 1. Hutchins provided a copy of the grievance and response to the medical department. *Id*. at 1. No reasonable jury could conclude, based on the record facts, that Hutchins responded in an unreasonable manner to the information Norman provided.

Because a reasonable jury could not find that Maddox or Hutchins violated Norman's constitutional rights, these Defendants are entitled to summary judgment based on qualified immunity.

**B.** ***It Is Not Clearly Established that Defendants' Actions Were Unconstitutional***

To overcome Defendant's qualified immunity defense, Norman not only must establish that they violated a constitutional right, he also must demonstrate that "the unlawfulness of their conduct was 'clearly established at the time.'" *Wesby*, 138 S. Ct. at 589 (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "Clearly established means that, at the time of the [defendant's] conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Wesby*, 138 S. Ct. at 589 (internal quotation marks and citations omitted). "The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Wesby*, 138 S. Ct. at 590 (citing *Reichle*, 566 U.S. at 666). "Otherwise, the rule is not one that 'every

reasonable official' would know." *Wesby*, 138 S. Ct. at 590 (quoting *Reichle*, 566 U.S. at 664).

"The 'clearly established' standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him." *Wesby*, 138 S. Ct. at 590. The contours of the legal principle "must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Wesby*, 138 S. Ct. at 590 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). The Supreme Court "repeatedly stresse[s] that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Wesby*, 138 S. Ct. at 590 (internal quotation marks and citation omitted).

In response to Defendants' assertion of qualified immunity, Norman has identified no precedent clearly establishing that any Defendant's conduct was unconstitutional. Norman relies on the general principle that, "under the Eighth Amendment a prison official may not inflict cruel and unusual punishment, which includes a prison officials duty to protect an inmate from violence." Doc. 35 at 12, ¶ 6. Norman also cites two Eleventh Circuit cases for the proposition that "[t]he duty of an officer to protect inmates in their care from assault by fellow inmates has been clearly established for years." *Id*. at 12, ¶ 8; *Id*. at 15, ¶ 5.  The two cases Norman

cites are *Goodman*, 718 F.3d at 1331, and *Rodriguez v. Sec'y, for Dep't of Corr.*, 508 F.3d 611 (11th Cir. 2007). *See* Doc. 35 at 13, ¶ 11 and 16, ¶ 7-8.

"In all but the most obvious cases, however, such a "highly general" standard is not enough to clearly establish the unconstitutionality of an officials' [sic] conduct." *Woodyard v. Ala. Dep't of Corr.*, 700 F. App'x 927, 931 (11th Cir. 2017) (citing *Marsh*, 268 F.3d at 1031-32 & n.9). Instead, "a plaintiff must be able to point to a binding, 'materially similar' precedent recognizing the violation." *Woodyard*, 700 F. App'x at 931 (citing *Marsh*, 268 F.3d at 1032). In *Marsh*, the court explained:

> For qualified immunity purposes, a preexisting precedent is materially similar to the circumstances facing an official when the specific circumstances facing the official are enough like the facts in the precedent that no reasonable, similarly-situated official could believe that the factual differences between the precedent and the circumstances facing the official might make a difference to the conclusion about whether the official's conduct was lawful or unlawful.

268 F.3d at 1032.

In *Goodman*, the Eleventh Circuit granted summary judgment *in favor of jail officials* on a pretrial detainee's deliberate indifference claim arising from being beaten by his cellmate. The court concluded that there was no evidence that the jail officials were subjectively aware of a risk of serious harm to the inmate, or that they deliberately disregarded that risk. 718 F.3d at 1332. The court also discussed that the officers' failure to conduct cell checks and head counts as required by jail policy, and their deactivation of emergency call buttons, was "negligence of the purest

form." *Id*. at 1332-33. *Goodman* does not clearly establish that the Defendants' conduct in this case was unconstitutional.

In *Rodriguez*, the prisoner (Rodriguez) had been segregated from the general prison population for security purposes, during which time he received specific death threats from members of his former gang who were prisoners in the general population. 508 F.3d at 613-15. Rodriguez told prison officials that he was a former gang member and that one or more members of his former gang, the Latin Kings, had issued a death threat against him. *Id*. at 621. Rodriguez told one official that the Latin Kings wanted to attack him because he did not want to continue being a Latin King, and that he feared they would kill him when he was released into the general population. Rodriguez detailed to the official that when he walked past the gang members they would shout to him that they were going to kill him. The prison officials denied Rodriguez's requests for protective management or transfer to a different facility. Within hours of Rodriguez's release into the general prison population, a member of the Latin Kings stabbed him in the chest and back. *Id*. at 615-16.

The Eleventh Circuit held that because Rodriguez told the prison officials that he was in fear for his safety and also relayed specific threats he had received, Rodriguez had shown that those officials had subjective knowledge that Rodriguez

faced a substantial risk of serious harm from his former gang members. *Id*. at 618-22.

Here, Norman did not tell Smith, Wilkes, or Parrish that he feared Berg, or that Berg made a specific threat against him. All Smith, Wilkes and Parrish knew was that Berg made a vague and general statement that he was "suicidal and homicidal" followed by cutting his arm. The Defendants responded by taking Berg to be evaluated by medical staff. The factual distinctions between this case and *Rodriguez* are enough to prevent *Rodriguez* from clearly establishing that Smith's, Wilkes's, or Parrish's conduct was unconstitutional.

The same is true of Maddox and Hutchins. Berg's grievance to Maddox did not threaten Norman. Norman's grievance to Hutchins related the March 28, 2020 incident and theorized that Berg's vague and general statement on March 28, 2020 that he was "suicidal and homicidal" could be interpreted as a threat to Norman's safety. But Berg's actions after that statement were exclusively self-harming. Norman did not seek protection from Berg specifically, but rather he sought transfer to a wing that did not house inmates with mental health issues. A reasonable officer could conclude that this situation was different from the one the officers in *Rodriguez* faced.

In short, none of the legal precedents Norman identifies clearly establish that the Defendants' responses to the situations they confronted amounted to deliberate indifference.

## VI. NORMAN'S OFFICIAL CAPACITY CLAIMS AND SOVEREIGN IMMUNITY

Norman states that he is suing each Defendant in his official capacity. Doc. 35 at 3. Sovereign immunity bars any damages claim against a state official-capacity defendant. *See, e.g., Edelman v. Jordan*, 415 U.S. 651 (1974) (holding that the Eleventh Amendment bars retrospective relief under § 1983 that would be payable from the state treasury).[5] Defendants are entitled to summary judgment on Norman's official-capacity claims, based on sovereign immunity.

## VII. NORMAN'S INDIVIDUAL-CAPACITY CLAIMS FOR COMPENSATORY DAMAGES

Norman seeks compensatory damages of an unspecified amount against each Defendant in his individual capacity. Doc. 35 at 11. The Defendants assert that should the District Court find that Norman's failure-to-protect claims are *not* subject to summary judgment based on qualified immunity, the Court should at least grant them summary judgment on the issue of compensatory damages, because Norman

---

[5] Norman does not seek prospective injunctive relief, nor could he, as such a claim would be mooted by his release from the FDC. *See, e.g., Cotterall v. Paul*, 755 F.2d 777, 780 (11th Cir. 1985) (holding that a prisoner's claim for injunctive relief was moot because he no longer was being held in the jail with the conditions he had challenged, and the risk of being sent back to that jail—and suffering from the threatened injury—was too speculative).

has not alleged any physical injury arising from the March 28, 2020 incident or his

confinement with Berg. Doc. 71 at 26-27.

The Prison Litigation Reform Act ("PLRA") imposes a "[l]imitation on

recovery" in federal civil actions brought by prisoners. 42 U.S.C. § 1997e(e). The

provision states:

> No Federal civil action may be brought by a prisoner confined in a jail,
> prison, or other correctional facility, for mental or emotional injury
> suffered while in custody without a prior showing of physical injury or
> the commission of a sexual act (as defined in section 2246 of Title 18).

42 U.S.C. § 1997e(e). The Eleventh Circuit has interpreted § 1997e(e) as barring

"requests for compensatory damages stemming from purely mental or emotional

harms" where no physical injury is shown. *Hoever v. Marks*, 993 F.3d 1353, 1358

(11th Cir. 2021).

A litigant's status as a prisoner under the PLRA is determined at the time he

files his lawsuit. *See* 28 U.S.C. § 1915(h); *Harris v. Garner*, 216 F.3d 970, 974, 979-

81 (11th Cir. 2000) (concluding that a plaintiff's status as a prisoner for purposes of

§ 1997e(e)'s limitation on suits "brought by a prisoner" is determined as of the time

the suit is filed, and that the confinement status of the plaintiff at any time thereafter

is "beside the point"), *overruled on other grounds, Hoever, supra*; *see also Jaros v.*

*Ill. Dep't of Corr.*, 684 F.3d 667, 668 n.1 (7th Cir. 2012) ("'[P]risoner' status under

the PLRA turns on whether the plaintiff was confined when the suit was filed."
(citing *Witzke v. Femal*, 376 F.3d 744, 750 (7th Cir. 2004))).

This action was filed by Norman when he was a prisoner. Doc. 1.
Accordingly, the Defendants are correct that § 1997e(e)'s limitation on
compensatory damages applies to Norman. The Defendants also are correct that
Norman has made no showing of a physical injury arising from the March 28, 2020
incident or his continued confinement with Berg.

The appropriate disposition of a damages claim barred by § 1997e(e),
however, is dismissal without prejudice to re-filing the claim when the plaintiff is
released. *Harris*, 216 F.3d at 979-80. The entry of summary judgment would be
tantamount to a dismissal *with* prejudice and, therefore, would be subject to reversal
under *Harris*. *See Harris*, 216 F.3d at 985 (vacating judgment that dismissed
damages claims with prejudice under § 1997e(e) and remanding with directions that
the claims "be dismissed without prejudice to their being re-filed at a time when the
plaintiffs are not confined.").

The District Court does not need to address Defendants' § 1997e(e) argument
*unless* it concludes that one or more of the Defendants are *not* entitled to qualified
immunity. If the District Court takes the latter course and denies qualified immunity
to one or more of the Defendants, the appropriate disposition of Norman's
compensatory damages claim would be to dismiss the claim without prejudice to re-

filing. The entry of summary judgment on Norman's compensatory damages claim would be improper due to its preclusive effect. *See Bazile v. Lucent Techs.*, 403 F. Supp. 2d 1174, 1181 (S.D. Fla. 2005) ("A judgment rendered upon a motion for summary judgment is a final judgment on the merits and is entitled to the full preclusive effect of any final judgment." (citing *Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 517 F.2d 110 (5th Cir. 1975))).

## VIII. NORMAN'S INDIVIDUAL-CAPACITY CLAIMS FOR PUNITIVE DAMAGES

Norman seeks punitive damages of an unspecified amount against each Defendant in his individual capacity. Doc. 35 at 11. The Defendants assert that should the District Court find that Norman's failure-to-protect claims are not subject to summary judgment based on qualified immunity, the Court should nevertheless grant them summary judgment on the issue of punitive damages, because no rational finder of fact could find that any Defendant's actions amounted to malicious or egregious conduct. Doc. 71 at 27-28.

As with the compensatory damages issue above, the District Court does not need to address the issue of punitive damages *unless* it denies qualified immunity to one or more of the Defendants. If the District Court denies qualified immunity, the undersigned recommends that summary judgment be granted in favor of the Defendant(s) on the issue of punitive damages.

"An award of punitive damages is authorized in a civil rights case if the defendant was motivated by an evil motive or intent, or there must be reckless or callous indifference to federally protected rights." *Davis v. Locke*, 936 F.2d 1208, 1214 (11th Cir. 1991). "The focus of punitive damages is on the character of the tortfeasor's conduct, not on any compensable injury that may flow from that conduct." *Hoever*, 993 F.3d at 1359 (internal quotation marks and citation omitted). Punitive damages are imposed on a defendant "for deterrence and punishment of his egregious misconduct." *Id*. at 1360; *see also Davis*, 936 F.2d at 1214 (finding jury award of punitive damages proper where evidence showed defendants' actions were motivated by racial animus and a desire to punish); *Wright v. Sheppard*, 919 F.2d 665, 670 (11th Cir. 1990) (holding that case "crie[d] out for punitive damages" where policeman at night under cover of uniform invaded home and injured resident).

Norman must establish that the particular Defendant's conduct toward *him* (as opposed to Berg) was motivated by an evil motive or intent, or was egregious. Norman has presented no evidence from which a rational trier of fact could find that any Defendant acted egregiously toward him. The Defendants, therefore, are entitled to summary judgment on Norman's individual-capacity punitive damages claims.

## IX. CONCLUSION

For the reasons set forth above, the undersigned respectfully **RECOMMENDS** that:

1.      Defendants' motion for summary judgment, Doc. 71, be **GRANTED** based on qualified immunity.

2.      The clerk of the court be directed to enter judgment accordingly and to close this case.

At Pensacola, Florida, this <u>26th</u> day of May, 2022.

/s/ *Michael J. Frank*
**Michael J. Frank**
**United States Magistrate Judge**

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days of the date of the report and recommendation. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.</u> An objecting party must serve a copy of the objections on all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions. *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.**